IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KATHERINE M. PLUNK                                                        PLAINTIFF

V.                                           NO. 13-5291

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration                 DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Katherine M. Plunk, brings this action pursuant to 42 U.S.C. §405(g),
seeking judicial review of a decision of the Commissioner of the Social Security
Administration (Commissioner) denying her claims for a period of disability and disability
insurance benefits (DIB) and supplemental security income (SSI) under the provisions of
Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must
determine whether there is substantial evidence in the administrative record to support the
Commissioner's decision. See 42 U.S.C. §405(g).

I.      **Procedural Background:**

Plaintiff protectively filed her applications for DIB and SSI on December 30, 2009,
alleging disability since January 24, 2006,[1] due to degenerative disc disease, migraine
headaches, anxiety, panic disorder, and moderate depression. (Tr. 142-153, 206, 210).  An
administrative hearing was held on March 9, 2012, at which Plaintiff appeared with counsel
and testified. (Tr. 32-71).

---

[1] Plaintiff originally alleged an onset date of June 1, 2004, and at the hearing held on March 9, 2012,  Plaintiff's
attorney amended the alleged onset date to January 24, 2006. (Tr. 40).

By written decision dated May 4, 2012, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe – lumbar spondylosis and mild depression. (Tr. 16).  However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the listing of impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr.  17).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except she is limited to work involving simple tasks and simple instructions. (Tr. 19).  With the help of a vocational expert (VE), the ALJ determined Plaintiff was capable of performing her past relevant work as a fast food worker. (Tr. 25).

Plaintiff then requested a review of the hearing decision by the Appeals Council, and on October 9, 2013, the Appeals Council adopted the ALJ's finding that Plaintiff was not disabled. (Tr. 4-7).  Subsequently, Plaintiff filed this action. (Doc.1). Both parties have filed briefs and this case is before the undersigned for report and recommendation. (Docs. 16, 17, 20).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

On May 11, 2005, Plaintiff began complaining of low back pain, mainly in the left back area with radiation of the pain on the back of her thigh distally to the level of the calf, at Mercy Health System of Northwest Arkansas (Mercy). (Tr. 257).  Pertinent examination revealed tenderness in her back, especially in the left buttock area.  Plaintiff was assessed with low back pain, most probably left sided sciatica. (Tr. 257).  She presented herself again

2

to Mercy complaining of low back pain on July 8, 2005, and Dr. Rossitza Hristoskova indicated that she had treated her in the recent past with low back pain, which almost resolved completely. (Tr. 260).

On January 3, 2006, Plaintiff presented herself to Dr. Robert E. Holder, who reported that Plaintiff was an obese, white female with low back pain. (Tr. 264). He found her range of motion was slightly decreased and there was palpable muscle spasm, but no neuromotor abnormalities. Dr. Holder assessed Plaintiff with lumbosacral strain/stress, and referred Plaintiff for physical therapy. (Tr. 264). On January 24, 2006, Plaintiff reported to Dr. Holder that she was tolerating the Effexor quite well, and that her back had improved somewhat. (Tr. 268). Plaintiff was assessed with "[d]epression improved with episodes of irritability." (Tr. 268).

Plaintiff next saw Dr. Holder on May 31, 2006, reporting that Darvocet had not been helping and she was found to have point tenderness. (Tr. 272). Plaintiff next saw Richard F. Hefner, ANP, on June 8, 2006, and was assessed with step [sic] pharyngitis and continued back pain. (Tr. 275). On June 13, 2006, Plaintiff complained to Dr. Holder of point tenderness in the left sacroiliac area, with radiation around the left lateral hip. (Tr. 278). It was then noted that Plaintiff had toughed it out six years ago, with physical therapy and rest. (Tr. 278).

An MRI was performed on June 21, 2006, resulting in the following impression:

1.  L4-L5 and L50S1 low grade spondyloarthropathy in this 26 year old female resulting in a nominal central and lateral canal encroachment at this juncture.

2.  Loss of the normal marrow signal of the pars interrarticularis bilaterally at L5-S1, for which stress reaction is favored secondary to impaction of the region by the tip of the superior facet of S1, but without evidence of frank spondylolysis and no evidence of spondylolisthesis at this juncture.

3.  Incidental notation made of accessor superior bundles of the piriformis muscle without definite morphologic features of piriformis syndrome, of which clinical correlation recommended.

4.  Academic supplements pertaining to the above-described findings are available on request by calling 463-780. Please ask for Baastrop phenomenon and piriformis syndrome.

(Tr. 244).

On June 28, 2006, Plaintiff was seen by Dr. James B. Blankenship, of The Neurosurgery Spine Center. (Tr. 245).   Dr. Blankenship found Plaintiff's neurologic examination was unremarkable, and noted that she was point tender over her left S1 joint and also had marked increased pain in flexion, with some pain in her hip and leg with flexion. (Tr. 245).  His impression was that Plaintiff did have some disc space changes with annular disruption at L4/5 and L5/S1.  However, he noted that the axial images did not demonstrate any significant neural impingement from the disc protrusions.   Dr. Blankenship recommended a left sided S1 joint injection by Dr. R. David Cannon, and an aggressive hands-on physical therapy program. (Tr. 245).   After Plaintiff completed four visits to Stephen A. Joseph, P.T., in a July 10, 2006 report completed by Mr. Joseph, he reported that Plaintiff was "pain free" and had been able to resume all of her routine activities of daily living, including caring for her two children. (Tr. 252).  She was able to incorporate her lumbar stabilization exercises into her routine, and he discharged her as her goals had been met. (Tr. 252).

Plaintiff received joint injections by Dr. Cannon in July and August of 2006. (Tr. 312, 317-318).   On October 13, 2006, Plaintiff complained to Dr. Holder of anxiety and depression, and her medications were changed due to insurance coverage. (Tr. 281).  Plaintiff

presented to Richard F. Hefner, ANP, on December 15, 2006, complaining of persistent low back pain, and indicated that the injections had been very helpful. (Tr. 284).

On December 29, 2006, Plaintiff presented herself to Dr. Holder, complaining of low back pain.  Dr. Holder recorded Plaintiff as an obese white female, who appeared to be in mild to moderate distress. (Tr. 287). Dr. Holder assessed her with chronic degenerative disc disease with lumbosacral spasm and pain, and discussed a possible weight loss procedure with her. (Tr. 287).   Dr. Holder noted on January 26, 2007, that Plaintiff was making progress with her weight.(Tr. 291).

On February 7,  2007, Plaintiff received a sacroiliac joint injection by Dr. Cannon and in a follow-up note of February 16, 2007, Plaintiff indicated she was "feeling awesome right now." (Tr. 316).

Plaintiff first complained of a headache to Richard F. Hefner, ANP, on March 6, 2007. (Tr. 294).  One week later, on March 15, 2007, Plaintiff presented herself to Dr. David L. Beeman to establish care, stating she felt tired, fatigued, and had decreased motivation and was irritable. (Tr. 370).

On April 30, 2007, Plaintiff reported to Dr. Beeman that with the low dose Methadone, her back pain actually improved, but she seemed to grow tolerant to it and was not really having any success with the Methadone. (Tr.304).  She also indicated her mood had improved with Cymbalta. (Tr. 304).  She was assessed with lumbar disc disease and depression with anxiety. (Tr. 304).  Dr. Beeman believed her depression with anxiety should be improved if he could get her back pain under control. (Tr. 304).

An MRI of Plaintiff's lumbar, performed on May 7, 2007, revealed no significant change in her degenerative disc disease. (Tr. 303).

On May 23, 2007, Plaintiff saw Dr. Regan S. Gallaher, of Northwest Arkansas Neuroscience Institute, PA. (Tr. 306).  Dr. Gallaher noted that Plaintiff smoked a pack of cigarettes per day, and in his report, indicated that Plaintiff reported physical therapy did not help much. He noted that Plaintiff had decreased flexion of the lumbar spine secondary to left hip pain and marked tenderness over her left S1 joint. (Tr. 306).  Dr. Gallaher assessed Plaintiff with probable S1 joint arthropathy. (Tr. 306).  He further indicated that he would not consider a fusion operation in a 27 year- old with mild degenerative disc disease, but if she was interested in talking to the neurosurgeons at Springfield Neurological and Spine Institute about artificial disk replacement, he would consider that. (Tr. 307).

On August 7, 2007, Plaintiff saw Dr. Chad Morgan, of Springfield Neurological & Spine Institute. (Tr. 300).  Dr. Morgan noted that Plaintiff's paraspinous muscles were symmetric and normal in tone without spasm, and her range of motion of the cervical and lumbar spine was normal.  Straight leg raise was tolerated to 80 degrees, femoral stretch was negative, her gait and station were normal, and there was normal range of motion, no joint instability or laxity, and upper and lower extremity strength was normal in tone. (Tr. 301). He gave the following impression:

1. Evidence of multilevel degenerative disc disease (L4/5 and L5/S1) and spondylosis is present without high-grade neural compression and no evidence of gross spinal deformity.

2. Tobacco use

3. Obesity, mild

4. Motivated patient with mechanical low back pain

5. Although operative considerations including arthroplasty or fusion were discussed, a more complete non-surgical treatment plan will first be implemented including tobacco cessation, physical therapy, aqua therapy, and EDSI.

6

(Tr. 302).

On October 8, 2007, Plaintiff advised Dr. Beeman that her low back pain was doing significantly better with Dr. Cannon . (Tr. 367).  Plaintiff wanted to stop her Methadone and Cymbalta, because she stated her depression and anxiety were doing much better because her back pain was improved after the injections with Dr. Cannon. (Tr. 367).  Dr. Beeman decreased her Methadone and Cymbalta, and recommended Ambien for her sleep issues. (Tr. 367).  On December 10, 2007, when Plaintiff presented to Dr. Beeman with a sore throat and congestion, he advised Plaintiff to quit smoking. (Tr. 366).

By March 3, 2008, Plaintiff told Dr. Beeman that since decreasing her Cymbalta, she was having decreased motivation and was fatigued. (Tr. 365).  Her degenerative disc disease was reportedly doing better with injections, and she was seeing a pain specialist. (Tr. 365).

Plaintiff's first visit to Ozark Guidance Center (OGC) was on April 28, 2008, where she was diagnosed with major depressive disorder "sing epis" moderate with postpartum onset, and a GAF score of 55. (Tr. 518). Plaintiff was discharged from OGC for lost contact on June 7, 2008, with the same diagnosis. (Tr. 514).

After receiving another injection on August 1, 2008, Plaintiff presented herself to Northwest Medical Center in Bentonville, on September 24, 2008, complaining of back pain, and was diagnosed with acute sciatica. (Tr. 325).  She was still complaining of back pain on September 29, 2008, and was reportedly out of steroids and pain medications and had no doctor. (Tr. 333).

On October 29, 2008, Plaintiff established care with Dr. Corwin Petty. (Tr. 393).  Dr. Petty reported that Plaintiff had lower back pain, was smoking cigarettes every day, and was a former illegal drug user. (Tr. 393-394).  Dr. Petty assessed Plaintiff with degenerative joint

7

disease of the lower spine. (Tr. 394).  Pursuant to Dr. Petty's instruction, Plaintiff tried using phenethyl patches (pain patches), and on December 29, 2008, Plaintiff reported the patches and gabapentin were working well. (Tr. 401).  Plaintiff was able to do more of her daily routine that she was having difficulty completing before. (Tr. 401).  On February 2, 2009, Plaintiff advised Dr. Petty that the insurance would not cover the patches and wanted to talk to him about other options. (Tr. 402).

On February 15, 2009,  a record from OGC indicates that Plaintiff reported things were going well. (Tr. 501).  On February 23, 2009, Plaintiff saw Dr. Beeman, and reported that she had been having difficulty with her overuse of her prescription pain medications, and that she and her husband had lost their house and were having significant financial difficulty. (Tr. 298). Plaintiff stated she felt like she was going through withdrawal after being off her MS Contin, and continued to take her Cymbalta for her anxiety and depression. (Tr. 298). Dr. Beeman assessed Plaintiff with chronic low back pain with degenerative disc disease, and advised Plaintiff he would refer her to Dr. Gallaher, her neurosurgeon specialist, who in the past had advised her of surgery for her degenerative disc disease. (Tr. 299).  Dr. Beeman also assessed Plaintiff with anxiety and depression and nausea and vomiting, most likely from her coming off her MS Contin. (Tr. 299).

Plaintiff saw Dr. Petty in March, April, May, July, and August of 2009, seeking medication changes and refills.  (Tr. 404, 406, 409, 411, 413, 415).   At the August of 2009 visit, Plaintiff reported having migraine headaches once a week in the previous three months. (Tr. 415).  At that visit, Dr. Petty changed Plaintiff's medication of hydrocodone to Dilaudid. (Tr. 416).

On August 26, 2009, Plaintiff was reported by OGC as abusing her prescribed Dialudid. (Tr. 507).  She was assessed by OGC as follows:

| Axis I: | Mood disorder, nos<br>R/O substance-induced mood d/o<br>Opioid dependence |
|---|---|
| Axis II: | no diagnosis |
| Axis III: | non known – reports: ddd; arthritis in hip |
| Axis IV: | problems with primary support group; economic problems; and other psychological and environmental  problems |
| Axis V: | Current GAF – 35 |

(Tr. 506).  In September of 2009, Plaintiff reported to OGC that she and her husband had separated and that she had stopped abusing the medications. (Tr. 504).

Plaintiff saw Dr. Petty on November 2, 2009, for refills, and on December 15, 2009, Dr. Petty's office reported that Sam's pharmacy called to tell him that Plaintiff had been using different pharmacies each month and that she was getting methadone from Dr. Beeman in Bentonville.  Dr. Petty verified such, and notified the pharmacy not to fill his prescription. (Tr. 431).  Plaintiff was assessed with breaching the narcotic contract. (Tr. 431).

On January 7, 2010, Dr. Ester Arejola Salvador, staff psychiatrist at OGC, saw Plaintiff, who indicated that she and her husband were back together, and that she was smoking less than a pack of cigarettes per day. (Tr. 496).  Dr. Salvador assessed Plaintiff as follows:

| Axis I: | Mood disorder nos, current episode depression with no psychosis<br>Opioid dependence in early remission<br>R/O substance induced mood disorder<br>PTSD<br>ADHD |
|---|---|
| Axis II: | None |

9

| | |
|---|---|
| Axis III: | Degenerative disc disease<br>Arthritis in left hip<br>Allergy to penicillin, sulfa, erythromycin |
| Axis IV: | Problems with primary support group. She is back with her husband but she continues to report conflict and verbal abuse. Economic problems, other psychosocial and environmental problems. |
| Axis V: | GAF – 45-55 |

(Tr. 498).

On January 25, 2010, Plaintiff saw Dr. Petty for follow-up on her medications, and stated they were working well. (Tr. 421). She indicated she had been seeing a psychologist and was started on Effexor and her dosage of Gapentin was increased. (Tr. 421). She was assessed with lumbago, degenerative joint disease, and anxiety syndrome. (Tr. 421).

Dr. Petty completed a Treating Physician's Report for Migraine Headaches on February 8, 2010, and reported that her migraines occurred twice weekly and that she did not require ER visits because narcotic prescriptions were available to her for use at home. (Tr. 391). He opined that she would be unable to complete tasks and required sleep frequently. (Tr. 391).

In a March 4, 2010 report, OGC reported that Plaintiff continued to report mood instability and that she was continuing to use narcotics and had not gone to group therapy since the end of January. (Tr. 535). In a March 12, 2010 report by OGC, Plaintiff was assessed as follows:

| | |
|---|---|
| Axis I: | Mood Disorder NOS<br>Opioid dependence, last intake two days ago<br>Rule out substance induced mood disorder<br>PTSD<br>ADHD |
| Axis II: | rule out borderline traits versus disorder |

10

| Axis III: | Degenerative discs disease, arthritis in left hip, allergy to penicillin, sulfa and erythromycin |
|---|---|
| Axis IV: | Problems with primary support group, recent big fight with husband who hit her again. There is an order of protection against husband. Economic problems, other psychosocial and environmental problems |
| Axis V: | Current GAF – 35-45 |

(Tr. 532).

On March 30, 2010, a Physical RFC Assessment form was completed by non-examining physician, Ronald Crow, D.O. (Tr. 457-464.  Dr. Crow found that Plaintiff would be able to perform light work. (Tr. 464).

On May 4, 2010, a Psychiatric Review Technique form was completed by non-examining consultant, Dr. Kay M. Gale. (Tr. 473-485).  Dr. Gale opined that Plaintiff had a mild degree of limitation in activities of daily living and in maintaining social functioning, and had a moderate degree of limitation in maintaining concentration persistence, or pace, and had no episodes of decompensation, each of extended duration. (Tr. 483).  She concluded that the overall information supported Plaintiff's ability to perform simple, routine, repetitive work and that no functional severity was documented. (Tr. 485).

On May 6, 2010, Dr. Terry L. Efird conducted a Mental Diagnostic Evaluation. (Tr. 465-468).  Dr. Efird noted that Plaintiff lost 50 pounds in the past year, was 5'2" and weighed 169 pounds. (Tr. 465).  Plaintiff advised Dr. Efird that her current medications were somewhat beneficial. (Tr. 466).  The ability to perform basic self-care tasks independently was endorsed as impaired by motivation for several days every couple of weeks, and the ability to perform household chores adequately was endorsed, with the same type of motivational difficulties. (Tr. 466).  Dr. Efird diagnosed Plaintiff as follows:

| Axis I: | Major depressive disorder, moderate; anxiety disorder NOS |
|---|---|

11

Axis II:        Deferred

Axis V:         55-65

(Tr. 467).   Dr. Efird found that Plaintiff communicated and interacted in a reasonably socially adequate manner and a reasonably intelligible and effective manner, and had the capacity to perform basic cognitive tasks required for basic work like activities. (Tr. 468).

On August 10, 2010, OGC completed a Discharge Summary, wherein it was noted that Plaintiff did not return/dropped out of treatment. (Tr. 524).

On October 7, 2010, non-examining consultant, Dr. Bill F. Payne, affirmed the assessment of March 3, 2010. (Tr. 546). Also on October 7, 2010, non-examining consultant, Dr. Kay Cogbill, affirmed the assessment of May 14, 2010. (Tr. 547).

**III.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents

12

the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC.  See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**III.    Discussion:**

13

Plaintiff raises the following issues in this matter: 1)  The ALJ and Appeals Council failed to consider Plaintiff's obesity; 2) The ALJ decision and Appeals Council decision are not supported by substantial evidence; and 3) Whether the ALJ properly considered the GAF scores of Plaintiff. (Doc. 16).

### A.        Plaintiff's Obesity:

Plaintiff argues that the ALJ failed to consider the claimant's impairment of obesity in his decision and did not perform a proper analysis of the effect the claimant's obesity had on her other impairments, limitations and her ability to engage in substantial gainful activity. Plaintiff further argues that the Appeals Council gave some consideration to the obesity issue, but erred in determining substantial evidence supported a determination that obesity did not affect the Plaintiff's ability to perform light work.

An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 1520(a)(4)ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § § 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to the severity standard.  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cri. 1989).

The Court first notes that Plaintiff did not list obesity as a disabling condition in her application documents, which is significant. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  In addition, in its decision, the Appeals Council considered Plaintiff's obesity, and concluded that the record did not document any related symptoms, diagnoses, or

14

recommendations for treatment. (Tr. 5).  The Appeals Council also found that there was no indication that medical providers either observed or imposed obesity-related limitations, and the Council therefore found the condition non-severe. (Tr. 5).

The Court recognizes that on December 29, 2006, Dr. Holder noted that Plaintiff was obese and discussed a possible weight loss procedure with her. (Tr. 287).  On January 26, 2007, Dr. Holder noted that Plaintiff was making progress with her weight. (Tr. 291).  On August 7, 2007, Dr. Chad Morgan diagnosed Plaintiff with obesity, mild. (Tr. 302). On May 6, 2010, Dr. Efird reported that Plaintiff had lost approximately 50 pounds in the previous year, was 5'2" and weighed 169 pounds. (Tr. 465).  There is no other documentation regarding Plaintiff's obesity, or any indication that the medical health providers limited Plaintiff's activity in any way because of her obesity.  An ALJ may discount the effects of obesity when no physician in the medical record ever placed physical limitations on that claimant's ability to perform work-related functions due to obesity.  See Forte v. Barnhart, 377 F.3d 892, 896-897 (8th Cir. 2004).

Based upon the foregoing, the Court believes Plaintiff has not established that her obesity constitutes a severe impairment, or that limitations on top of the restriction to light work are warranted due to obesity.

**B.    Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While

an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In his decision, the ALJ noted that Plaintiff gave conflicting reports of her ability to engage in activities of daily living, and pointed to specific instances of inconsistencies. (Tr. 20).  The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with his RFC determination. (Tr. 20).  He also found that Plaintiff's allegation of disabling back and left hip pain were not consistent with the objective evidence, and discussed the lack of evidence supporting the severity of Plaintiff's allegations. (Tr. 21). The ALJ noted that the medical evidence suggested treatment was effective in controlling the Plaintiff's alleged pain, and discussed the large gaps in treatment for low back pain or lift hip pain. (Tr. 21).  Finally, the ALJ noted there was evidence suggesting that some of the Plaintiff's treatment for back pain was not actual treatment seeking behavior, as was evidenced by Plaintiff's testimony that she had been arrested for obtaining a controlled substance by fraud or theft. (Tr. 21).  The ALJ also noted that Plaintiff was reported as receiving narcotic pain medication prescriptions prescribed by multiple physicians and having those prescriptions filled at different pharmacies. (Tr. 21).

The Court believes, based upon the foregoing, that there is substantial evidence to support the credibility findings of the ALJ and Appeals Council.

16

## C.    RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.  "The ALJ is permitted to base its RFC determination on 'a non-examining physician's opinion and other medical evidence in the record.'" Barrows v. Colvin, No. C 13-4087-MWB, 2015 WL 1510159 at *15 (quoting from Willms v. Colvin, Civil No. 12-2871, 2013 WL 6230346 (D. Minn. Dec. 2, 2013).

The ALJ considered all of the medical records, the opinions of Plaintiff's treating physicians as well as the opinions of the state agency, and gave appropriate weight to the opinions.  Accordingly, the Court believes there is substantial evidence to support the ALJ's RFC determination.

## D.    GAF Scores:

Plaintiff argues the ALJ did not properly consider Plaintiff's low GAF scores.  In his decision, the ALJ discussed in some detail Plaintiff's GAF scores, recognizing that some of her scores were as low as 35. (Tr. 23).  However, he did not find the GAF scores to be a reliable measure of functional ability "as GAF scores reveal only a picture in time and do not necessarily correlate with disability. " (Tr. 23).  He concluded that while the scores would be useful in tracking the effectiveness of mental health treatment, they would not be as significant in determining disability. (Tr. 23). The ALJ then referred to Dr. Efird's May of 2010 evaluation, wherein he noted no significant limitations in Plaintiff's social or cognitive function, and that Plaintiff reported she was capable of performing most activities of daily living, with motivation problems about every two weeks. (Tr. 23).

A GAF score is not essential to the RFC's accuracy.  Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). "[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010).

The Court believes the ALJ properly considered the GAF scores in weighing the record as a whole, and accounted for mental limitations in the RFC assessment by restricting Plaintiff to unskilled work requiring simple instructions and simple tasks.

**E.      Hypothetical Question to the VE:**

Plaintiff appears to argue the hypothetical question presented to the VE did not include all of Plaintiff's impairments.

At the hearing, the ALJ posed the following hypothetical question to the VE:

Q: Let me give you a couple of hypothetical questions. The first is assume we have an individual who is the same age, education and work background as that of the claimant. Assume further this individual were [sic] limited from an exertional standpoint to no more than light work. Assume further this individual would need a job which involves simple tasks and simple instructions. Would that compromise the jobs base?

A: Yes, sir. It would.

Q: Well, let me rephrase that. Would that compromise the ability to perform any of those jobs you just listed?

A: Yes, sir. I believe that would eliminate the childcare and the office clerk.

Q: The fast food worker would still be relevant?

A: Yes, sir, as well as the fast food cook.

(Tr. 64).

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing her past relevant work as a fast food worker. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**IV.    Conclusion:**

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28**

19

**U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of September, 2015.

s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE